UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 06 CR 0061 |
| WASIU MUSTAPHER | ) | Judge Ruben Castillo |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Agents of United States Immigration and Customs Enforcement ("ICE"), a branch of the Department of Homeland Security, arrested defendant Wasiu Mustapher on January 25, 2006. (R. 53, Tr., Mustapher Test. at 5.) After arresting Mustapher, agents searched his apartment where they found a digital scale, a telephone, some documents, a passport, and $8,560. (*Id.* at 10-11; *id.*, Nicodemus Test. at 78; R. 9, Indictment at 4.)[1] Mustapher has been charged with possessing a controlled substance with the intent to distribute and conspiring with his co-defendant to do the same. (R. 9, Indictment.) Before the Court are Mustapher's motion to quash his arrest and motion to suppress the evidence obtained during the search of his apartment. (R. 35.) For reasons set forth below, his motions are denied.

## BACKGROUND

This Court held a hearing on July 27, 2006, to evaluate the merits of Mustapher's motion. The following facts were derived from the testimony given at that hearing by Mustapher and three ICE agents: SA Nicodemus, Senior Special Agent ("SSA") Anthony Romolino, and SSA Liam O'Neill.

---

[1] Special Agent ("SA") Robert Nicodemus was one of the arresting ICE agents.

After a year-long investigation, ICE agents identified Mustapher as an individual known as "Lamo." (R. 53, Tr., Nicodemus Test. at 59-60.) The agents believed that Lamo supplied another individual, Habib Solebo, with heroin to sell. (*Id.* at 67, 76.) Under agency supervision, a cooperating defendant ("CD") arranged to obtain drugs from Solebo outside an apartment building on West Granville Avenue in Chicago, Illinois. (*Id.* at 68-75.) After Solebo gave the drugs to the CD, multiple ICE agents arrested Mustapher at gun point near the apartment building. (*Id.*, Mustapher Test. at 5; *id.*, Nicodemus Test. at 75-76; *id.*, Romolino Test. at 111.) The agents handcuffed Mustapher, searched him, and placed him in the front passenger seat of an agent's vehicle. (*Id.*, Mustapher Test. at 7-8; *id.*, Romolino Test. at 111-12.) They drove him to his own apartment on West Pratt Avenue and then to an ICE office.

On the same day of his arrest, Mustapher signed an ICE consent-to-search form that SSA Romolino completed with Mustapher's name and address. (*Id.*, Romolino Test. at 112.) The substance of the form provided:

> I, <u>Wasiu Mustapha</u>, hereby a [sic] authorize <u>SSA Anthony Romolino</u> Officers of the Department of Homeland Security, United States Immigration and Customs Enforcement, to conduct a complete search of my <u>apartment</u> described as <u>1263 W. Pratt Apt #414</u>. These Officers are authorized by me to take any letters, papers, materials, or any other items/property which they may desire. This written permission is being given by me to the above Officers voluntarily, without promise or threats being made.

(R. 56-1, Gov't Mem., Ex. 2) (underlined portions completed by SSA Romolino). Below the text of the form are two signature blocks. The first signature block consists of three lines: one for the consenting person's signature; one for the consenting person's name in print; and one for the "date/time." (*Id.*) Below the first signature block is a second one, consisting of two more lines, one for a witness's name and one for the "date/time." (*Id.*) Mustapher signed the appropriate

2

line in the first signature block. (*Id.*; R. 53, Tr., Mustapher Test. at 13-14.) The "date/time" line below his signature contains the date, written by Mustapher (R. 53, Tr., Romolino Test. at 116, 120), followed by two different times. (R. 56-1, Gov't Mem., Ex. 2.) The first time reads "1:50" and is scratched out and the second time reads 12:05 p.m. (*Id.*) The second signature block contains SSA Romolino's signature, the date, and the time, which is recorded as 12:05 p.m. (*Id.*)

The government and Mustapher present different accounts of the circumstances surrounding Mustapher signing the consent-to-search form. We begin with the government's version of events. SSA Romolino testified that when he arrived at the scene of the arrest, Mustapher was against the car in a prone position. (R. 53, Tr., Romolino Test. at 111.) According to SSA Romolino, he handcuffed Mustapher and searched him. (*Id.*) SSA Romolino testified that he placed Mustapher in the passenger side front seat of his four-door Chevy Blazer, where he had Mustpaher's handcuffs removed, read aloud the consent-to-search form, and presented the form to Mustapher to sign. (*Id.* at 112-15.) According to SSA Romolino, Mustapher orally consented to a search and also read the consent-to-search form and signed it. (*Id.* at 114.) SSA Romolino stated that before presenting the form to Mustapher, he asked Mustapher if he spoke English and that Mustapher replied that he did. (*Id.* at 113.) However, he did not ask Mustapher if he could read English. (*Id.* at 113-14.) SSA Romolino testified that Mustapher did not request that the form be translated and that Mustapher told him that he understood the form. (*Id.* at 115.) With regard to the two times recorded on the "time/date" line under Mustapher's signature, SSA Romolino explained that he scribbled out "1:50" on the consent form because it was the time the search ended. (*Id.* at 116.) He then wrote in the time that Mustapher actually consented to the search as being 12:05 p.m., which he knew because this

3

was the time he had written below his own signature. (*Id.*) SA Nicodemus's testimony supported SSA Romolino's assertion that Mustapher signed the form in the car before the search; he testified that prior to the search SSA Romolino told him that he had obtained oral consent, and that SSA Romolino had showed him the signed consent-to-search form. (*Id.*, Nicodemus Test. at 77; *id.*, Romolino Test. at 121.)

In contrast to the government's version of events, Mustapher testified that although he did sign the consent-to-search form, his signature was not voluntary. (R. 55, Def.'s Br. at 7-8.) According to Mustapher, he was in handcuffs in SSA Romolino's car when the agents searched his apartment. (R. 53, Tr., Mustapher Test. at 11; *id.*, Ex. 6, Affidavit.) He testified that after the search was completed the agents took him to an ICE office, and it was there that an agent asked him to sign the consent-to-search form. (*Id.*, Mustapher Test. at 12-13.) According to Mustapher, he thought that he was required to sign the consent-to-search form before he could see an attorney. (*Id.* at 13; R. 55, Def.'s Br. at 8.) Mustapher testified that his first language is Yoruba, a language commonly spoken in his native Nigeria. (R. 53, Tr., Mustapher Test. at 8.) While he acknowledged that he speaks a little English, he asserted that he cannot read or write English and that no one read the consent-to-search form to him. (*Id.* at 13-14.) Therefore, he asserts that he did not read or understand the consent-to-search form. (*Id.*)

## MOTION TO QUASH THE ARREST

We begin with Mustapher's argument that his arrest should be quashed because the ICE agents lacked probable cause to make a warrantless arrest, in violation of the Fourth and Fifth Amendments to the United States Constitution.

### I.    Legal Standard

4

The Fourth Amendment protects against unreasonable arrests. *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995); *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). A warrantless arrest is reasonable if law enforcement agents "have probable cause, under the totality of the circumstances, to reasonably believe that a particular individual has committed a crime." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Under the probable cause standard, law enforcement agents may rely on their training and experience to make reasonable inferences from the facts. *Funches*, 327 F.3d at 586. The showing required for probable cause is lower than the reasonable doubt standard or even the preponderance of the evidence standard. *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975); *Funches*, 327 F.3d at 587.

When the police rely on confidential informants, such as the cooperating defendant in this case, determining whether there was probable cause for an arrest depends on an assessment of the informant's "'reliability, veracity and basis of knowledge.'" *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005) (quoting *United States v. Johnson*, 289 F.3d 1034, 1038 (7th Cir. 2002)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). In making this assessment, courts may consider "the informant's past record of reliability, through independent confirmation or personal observation by the police, or by other methods." *United States v. Rucker*, 138 F.3d 697, 700 (7th Cir. 1998) (quotation marks and citation omitted).

**II.     Analysis**

The ICE agents gathered considerable information over the course of their year-long investigation suggesting that Mustapher was a person who went by the name "Lamo" and supplied Solebo with heroin. ICE agents testified that Solebo and the CD communicated on at

5

least four occasions between January 2005 and January 19, 2006. In each conversation, Solebo told the CD that Lamo had heroin. (R. 53, Tr., Nicodemus Test. at 50-51, 55-56, 56-58, 66-68.) ICE agents made an audiovisual recording of one of Solebo and the CD's meetings at which Solebo provided the CD with a sample of heroin and informed the CD that Lamo was the source. (*Id.* at 66-68.) The CD met Lamo in person on January 13, 2005. (*Id.* at 53-54.) At that meeting, Lamo discussed using the CD as a drug courier. (*Id.*) Later, the CD identified Mustapher as Lamo from a photograph and again when Mustapher was leaving a mosque. (*Id.* at 54, 59.) Additionally, the CD provided a telephone number for Lamo. (*Id.* at 51.) That number, and the address associated with it, matched the information provided by Mustapher on a credit application that was found during a search of a car dealership suspected to be involved in a heroin smuggling operation. (*Id.* at 51, 63-65.) Finally, ICE agents observed suspicious activity involving both Mustapher and Solebo on December 13, 2005. On that day, agents observed Mustapher and Solebo drive together in Mustapher's car to an alley where they met briefly with persons in a second vehicle. (*Id.* at 63.) Accordingly, the ICE agents had ample evidence suggesting that Mustapher was Lamo and that he was involved in the illegal drug trade.

Further, Mustapher's behavior the morning of January 25, 2006, gave the agents reason to believe that he was involved in the drug transaction they were observing. That morning, ICE agents prompted the CD to call Solebo to consummate the planned heroin transaction. (*Id.* at 69-71.) Agents watched Solebo leaving Mustapher's residence at 10:55 a.m. (*Id.* at 71.) They observed Mustapher driving into a parking lot adjacent to Solebo's building at 11:37 a.m. (*Id.* 71-74.) At 11:40 a.m., agents saw Mustapher driving out of the parking lot. (*Id.* at 73.) He drove past the CD, who was sitting in a parked vehicle, made eye contact with him, and then

turned back into the parking lot and drove out of sight. (*Id.* at 73-74.) At 11:41 a.m., the CD walked to the building where Solebo showed him a bag of drugs. (*Id.* at 74.) The CD then returned to the vehicle, and Solebo brought the drugs to him. (*Id.* at 75.) Agents arrested Solebo at 11:48 a.m. when he brought the drugs to the CD's vehicle. (*Id.* at 75-76.) They arrested Mustapher shortly thereafter as he was pulling out of the parking lot of the building at 2035 West Granville Avenue. (*Id.*) The timing of Mustapher's activities that morning suggest his involvement in the drug transaction—he appears to have met with Solebo prior to the transaction at his apartment, he arrived at Solebo's apartment building just prior to the exchange, and he attempted to leave the parking lot just after the transaction. Considering that probable cause requires only a reasonable belief of illegal activity, *Gilbert*, 45 F.3d at 1166, we find that the ICE agents had probable cause to believe that Mustapher was involved in the drug transaction.

We do not find persuasive Mustapher's argument that the CD was unreliable. Mustapher points out that the CD never produced a recorded conversation with Lamo, and that he made several alleged misidentifications of Lamo. Based on the foregoing, Mustapher equates the CD's information as "no more a legitimate basis for probable cause than an anonymous informant's tip." (R. 55, Defs.' Br. at 2-4.) The Court disagrees with Mustapher's characterization of the CD's reliability. First, the case law does not require a recorded conversation with Lamo himself to establish the CD as reliable. *See United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998) (finding evidence obtained from a confidential informant sufficient for probable cause even though the informant's interactions with the defendant were not recorded). Second, the alleged misidentifications were minor errors that do not undercut the general reliability of the CD. Two of the alleged misidentifications were not even made by the CD—they were actually

made by ICE agents who attempted to locate Lamo based on descriptions of him and his car. (R. 53, Tr., Nicodemus Test. at 80-81.) The third misidentification occurred when the CD briefly misidentified an individual getting into a Jetta outside a mosque as possibly being Lamo. (*Id.* at 58-60.) The CD quickly corrected his mistake and identified Mustapher as Lamo. (*Id.* at 59-60.) None of these misidentifications is so great as to undercut the CD's reliability, given the fact that he had a year-long working relationship with ICE agents (*see id.* at 49-50), and the agents had corroborated many of his assertions through surveillance, most notably the recorded meeting in which the CD obtained a sample from Solebo (*id.* at 66-68). *See United States v. Oliva*, 385 F.3d 1111, 1114 (7th Cir. 2004) (finding a new informant reliable when a planned drug transaction began as the informant stated it would); *McKinney*, 143 F.3d at 329 (holding that a controlled buy is a particularly powerful form of corroboration in a drug case and strongly boosts an informant's reliability).

For the foregoing reasons, we conclude that the agents reasonably relied on the CD's identification of Mustapher as Lamo. Accordingly, we conclude that the ICE agents had probable cause to arrest Mustapher, and his motion to quash the arrest is therefore denied.

## MOTION TO SUPPRESS EVIDENCE

Mustapher next argues that the evidence obtained from the warrantless search of his apartment at 1263 West Pratt Avenue should be suppressed because he did not voluntarily consent. The government counters that Mustapher voluntarily signed a consent-to-search form prior to the search and that therefore, the evidence should not be suppressed.

### I. Legal Standard

A search conducted without a warrant does not violate the Fourth Amendment if an

8

authorized person voluntarily consents to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005). Voluntariness is measured by whether a reasonable observer would determine that the consenting person acted voluntarily. *Grap*, 403 F.3d at 444. The government bears the burden of proving that consent was freely and voluntarily given by a preponderance of the evidence; or, in other words, that it was more likely than not that consent was voluntary. *Id.* at 443; *United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004).

The Court considers the totality of the circumstances when determining whether consent was given voluntarily. *Grap*, 403 F.3d at 443 (citing *Schneckloth*, 412 U.S. at 248). The Seventh Circuit has identified a number of factors that aid in the determination of whether consent was given voluntarily, including: (1) the age, education, intelligence, mental health, and capability of the consenting person; (2) the length of detention prior to consent; (3) whether the person consented immediately or only after repeated requests by law enforcement agents; (4) whether coercion was used; (5) whether the person consenting was in custody; and (6) whether the consenting person was advised of the right to refuse. *Id.* (citing *Schneckloth*, 412 U.S. at 249); *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000). In the totality of the circumstance inquiry, the presence or absence of any one factor is not determinative. *Strache*, 202 F.3d at 985.

**II.    Analysis**

The Court begins its analysis by considering Mustapher's age, education, intelligence, and mental health. Mustapher was forty years old at the time of his arrest, and he attended both primary and secondary school in Nigeria. (R. 53, Tr., Mustapher Test. at 19.) Mustapher's

9

testimony at the hearing demonstrated that he understands spoken English well enough to get by without an interpreter. However, Mustapher does not have the same understanding of written English. At his hearing, he did not recognize his own affidavit stating that he had not consented to the search, even denying its veracity until his attorney read it to him. (*Id.* at 41, 43-44.) Although Mustapher could not have read the consent-to-search form, based on his understanding of spoken English, we find that he is capable of asking questions about what forms mean and he understands verbal responses. Thus, he was capable of understanding the consent-to-search form with the aid of SSA Romolino despite his limited understanding of written English. Further, at the time of his arrest Mustapher was familiar with the American legal system, having been arrested in September 2004, gone to trial, and been acquitted. (*Id.* at 25-26, 61-62.) This experience should have alerted Mustapher to the importance of asking questions about any papers he signed. Therefore, the Court finds that Mustapher's experience with the legal system and his adequate understanding of spoken English made him fully capable of giving voluntary consent when he signed the consent-to-search form.

The Court considers next the circumstances under which Mustapher signed the consent-to-search form. The Court credits the testimony of agents Romolino and Nicodemus as to the circumstances surrounding Mustapher signing the consent-to-search form. Both law enforcement agents have years of experience (*id.*, Nicodemus Test. at 48; *id.*, Romolino Test. at 107), and after observing their demeanor under oath, the Court finds their version of the events more credible than Mustapher's version. While the Court is troubled by the scribbled-out time on the first signature block of the consent-to-search form, it appears that the form was, in fact, completed at 12:05 p.m. on January 25, 2006, before the search took place. First, both agents

Nicodemus and Romolino testified that Mustapher signed the consent-to-search form in SSA Romolino's vehicle prior to the search. (*Id.*, Nicodemus Test. at 77; *id.*, Romolino Test. at 112-15.) Second, Agent O'Neill denied that he completed the form with Mustapher later that day. (*Id.*, O'Neill Test. at 131-32.) Third, although we are perplexed as to why SSA Romolino waited until after the search to record the time Mustapher signed the consent-to-search form, we find his explanation credible that he originally wrote "1:50" because that was the time the search ended and then scribbled it out and replaced it with 12:05 p.m. because that was the time that Mustapher actually signed the form. (*Id.*, Romolino Test. at 116-17.) Thus, we believe the agent's assertion that he gave Mustapher the consent-to-search form while in the front passenger seat of an ICE vehicle shortly after Mustapher's arrest and that Mustapher was not wearing handcuffs at the time. We further find SSA Romolino's testimony credible that he read the consent-to-search form to Mustapher and also obtained Mustapher's oral consent to the search. Though the agents had Mustapher in custody at the time he signed the form, they fully informed him of what he was signing, and there was no evidence that they coerced him. The consent form did not notify Mustapher of his right to refuse, but this alone does not render Mustapher's consent involuntary. *See Schneckloth*, 412 U.S. at 248-49. Therefore, the Court finds that the government has demonstrated by a preponderance of the evidence that agents did not use coercion or deception to obtain Mustapher's consent and that Mustapher voluntarily signed the form.

The Seventh Circuit's decision in *Grap* supports our conclusion that Mustapher voluntarily signed the consent-to-search form. In *Grap*, a police detective obtained the consent of the defendant's mother to search a garage. 403 F.3d at 441. The detective read a consent form

aloud before giving it to the woman to sign. *Id.* After signing, she aided the detective in opening the garage and conversed with him about her husband's guns. *Id.* The detective stated that she seemed to understand everything and did not seem confused. *Id.* It was later revealed, however, that the defendant's mother suffered from a mental illness that impaired her ability to make rational decisions. *Id.* at 441-42. Despite her mental illness, the court found her consent voluntary because the objective facts would not have put a reasonable agent on notice that she could not voluntarily consent. *Id.* at 445. Similarly, the agents had no indication that Mustapher did not understand that he was consenting to a search. The agents knew Mustapher was from Nigeria, a country with an official language of English. (R. 53, Tr., Nicodemus Test. at 101.) SSA Romolino testified that Mustapher stated that he understood English, consented orally, and did not ask any questions about the form. (*Id.*, Romolino Test. at 112-15.) Thus, as in *Grap*, there was no violation of the Fourth Amendment because an objectively reasonable law enforcement agent would not have realized that Mustapher lacked the ability to understand the consent-to-search form.

## CONCLUSION

For the foregoing reasons, Mustapher's motion to quash his arrest and suppress the evidence obtained during the search of his apartment is denied.

ENTERED: /s/ Ruben Castillo

Judge Ruben Castillo
United States District Court

**Dated:** October 26, 2006